# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>              Respondent,<br><br>   v.<br><br>NAVARONE GREGORY RANDMEL,<br><br>              Appellant. | No. 73531-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: November 14, 2016 |

LEACH, J. — Navarone Randmel appeals his convictions for possession of stolen vehicles, resisting arrest, and obstructing a law enforcement officer. He claims the trial court's inclusion of definitional terms in the "to-convict" jury instruction added elements that the State did not prove. Also, he challenges the admission of statements he made during a custodial interrogation and the State's reference to his silence during that interrogation. We reject each of these arguments.

This court recently decided that including the definition of "possession" in a to-convict instruction did not require the State to prove any additional elements or "false alternative means" created by adding that definition. Because Randmel did not unequivocally invoke his right to remain silent, the Fifth Amendment did not prohibit the officer from questioning him further. The Washington Constitution does not provide broader protections in this context. Thus, Randmel did not invoke his right to remain silent, and the prosecutor could reference his statements in closing argument.

We affirm Randmel's convictions. But because the trial court failed to make an individualized inquiry into Randmel's ability to pay before imposing discretionary legal financial obligations (LFOs), we remand for resentencing.

Background

Bellingham police officers arrested Randmel after a series of car thefts in December 2014 and January 2015. Officers testified that they twice found Randmel behind the wheel of stolen cars and stopped him. Both times the suspect ran away, and both times the police tracked him with a police dog but did not find him.

The third time, the dog caught him. Officer Joel Douglas read Randmel his Miranda[1] rights. Randmel acknowledged that he understood his rights and that he was willing to talk. Randmel then told the officers that he ran away because he was scared, that he did not know the car had been reported stolen, and that he had gotten the car from a friend's house. Randmel was taken to a hospital for treatment for dog bites.

Officer Jeremy Woodward went to the hospital to question Randmel. Douglas told Woodward that Randmel had agreed to speak. Woodward then asked Randmel about the previous car thefts. Woodward testified that he asked Randmel to "tell me basically where he ran" in those incidents because Woodward wanted to know if his "dog was doing his job properly." Randmel responded that "'he would rather not say.'"

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Woodward then said to Randmel, "[H]ow about I describe where we tracked and you can tell me whether or not we were correct." Woodward then described the two previous tracking incidents. Randmel told him it sounded about right and that Woodward had a good dog. Woodward then asked if Randmel had been hiding in a tree during the second track. Randmel again responded that "'he would rather not say but that he has been known to climb trees.'"[2]

Randmel testified that he did not know anything about the first two stolen cars and had been at home sleeping both nights. He testified that he had not stolen the third car—only taken a pair of boots out of it—and that he ran when the police came because he had taken the boots.

The State charged Randmel with three counts of possessing a stolen vehicle, two counts of resisting arrest, and one count of obstructing a law enforcement officer.

The trial court held a CrR 3.5 hearing to determine the admissibility of the statements Randmel made to Woodward at the hospital. The State asserted that Randmel "never made an unequivocal statement asking that all questioning should cease." Randmel's counsel did not challenge this statement. The trial court found that Randmel made the statements after a voluntary, knowing, and intelligent waiver of rights and admitted the statements.

---

[2] Randmel testified that when Woodward asked about the previous incidents, Randmel thought they were discussing the night he was arrested.

The jury found Randmel guilty as charged. The trial court imposed on Randmel over $2,000 in discretionary LFOs. It later found Randmel indigent for purposes of pursuing an appeal. Randmel appeals.

## Standard of Review

We review constitutional questions de novo.[3] We also review de novo a trial court's conclusions of law after a CrR 3.5 hearing.[4]

## Analysis

### Sufficiency of the Evidence

Randmel first contends that because the State included the definition of "possession" in its to-convict instruction, the law of the case doctrine required the State to prove each of the five methods of possession. Since the State did not present evidence about two of the methods, he claims that this court must reverse his conviction.

In State v. Tyler,[5] this court rejected this argument on identical pertinent facts. We followed the United States Supreme Court decision in Musacchio v. United States[6] that "'when a jury instruction sets forth all the elements of the charged crime but incorrectly adds one more element, a sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction.'"[7]

---

[3] State v. Castro, 141 Wn. App. 485, 490, 170 P.3d 78 (2007).
[4] State v. Grogan, 147 Wn. App. 511, 516, 195 P.3d 1017 (2008).
[5] 195 Wn. App. 385, ___ P.3d ___ (2016), petition for review filed, No. 93770-2 (Wash. Oct. 27, 2016).
[6] ___ U.S. ___, 136 S. Ct. 709, 193 L. Ed. 2d 639 (2016).
[7] Tyler, 195 Wn. App. at 395 (quoting Musacchio, 136 S. Ct. at 715).

Tyler controls the outcome in this case. A jury unanimously convicted Randmel of possessing a stolen vehicle, a single-means crime. The trial court's inclusion of the definition of "possession" in the to-convict instruction did not obligate the State to prove every method of possessing a stolen vehicle. The State presented evidence sufficient for the jury to find that Randmel possessed a stolen vehicle. We therefore reject Randmel's claim.

## Right against Self-Incrimination

Next, Randmel asserts that the trial court violated his right against self-incrimination under both the Fifth Amendment to the federal constitution and article I, section 9 of the Washington Constitution. Randmel's challenge raises several issues, which we address in turn.

First, the State asserts that Randmel waived his challenge to admission of self-incriminating statements by failing to make this challenge at the CrR 3.5 hearing. We disagree.

In general, this court may decline to address issues a party raises for the first time on appeal.[8] But this court will consider for the first time on appeal a claim of a "manifest error affecting a constitutional right."[9] An error is "manifest" if it resulted in "actual prejudice," meaning that it had "practical and identifiable consequences" at trial.[10]

---

[8] RAP 2.5(a).
[9] RAP 2.5(a)(3).
[10] State v. Kalebaugh, 183 Wn.2d 578, 584, 355 P.3d 253 (2015).

As the error Randmel claims—violation of his right against self-incrimination—is plainly constitutional, we need only to ask whether that error is "manifest." We find that it is. The admission of the statements Randmel made after responding to a question from Woodward that he "would rather not say" had "practical and identifiable consequences." At trial, Randmel asserted an alibi defense. The statements he made after purportedly invoking his right to remain silent contradicted that alibi by implying his presence at the first two incidents of car theft and the ensuing dog trackings. The State's argument that the other evidence against Randmel was overwhelming does not persuade us. There was a strong likelihood that Randmel's statements influenced the jury's weighing of the evidence as to the first two counts of possessing a stolen vehicle. We conclude that this claim is appropriate for our review.

Next, the State claims that the record is inadequate for this court to review Randmel's self-incrimination claim. The State does not support its argument with authority, nor does it explain what more context for Randmel's statements this court needs to decide whether Randmel's rights were violated. And although, as the State concedes, the trial court should have made written findings after the CrR 3.5 hearing, that error is harmless because the trial court's oral findings are sufficient for our review.[11]

---

[11] CrR 3.5(c); State v. Miller, 92 Wn. App. 693, 703, 964 P.2d 1196 (1998).

We therefore review the merits of Randmel's Fifth Amendment claim. First, Randmel asserts that he unequivocally invoked his right to remain silent and the trial court therefore erred in admitting his ensuing statements. We disagree.

The state and federal constitutions protect a defendant's rights against self-incrimination.[12] Under both, the State may not use a defendant's statements made during a custodial interrogation unless the defendant was informed of certain rights.[13] The defendant can waive those rights as long as the waiver is knowing, voluntary, and intelligent.[14] Any time after this waiver, the defendant can stop an interrogation by invoking those rights.[15] This invocation must be unequivocal.[16] Under the federal constitution, officers do not need to stop questioning to clarify equivocal or ambiguous invocations.[17] An invocation is unequivocal if the defendant makes it in an "objectively clear way,"[18] or if "a 'reasonable police officer in the circumstances' would understand it to be an assertion of the suspect's rights."[19] "This test encompasses both the plain language and the context of the

---

[12] U.S. CONST. amend. V; WASH. CONST. art. I, § 9.

[13] In re Pers. Restraint of Cross, 180 Wn.2d 664, 682, 327 P.3d 660 (2014); Miranda, 384 U.S. at 444.

[14] State v. Piatnitsky, 180 Wn.2d 407, 412, 325 P.3d 167 (2014), cert. denied, 135 S. Ct. 950 (2015).

[15] Cross, 180 Wn.2d at 682.

[16] Berghuis v. Thompkins, 560 U.S. 370, 381, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010).

[17] Berghuis, 560 U.S. at 375.

[18] Piatnitsky, 180 Wn.2d at 412.

[19] Cross, 180 Wn.2d at 682 (quoting Davis v. United States, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994)); Piatnitsky, 180 Wn.2d at 412-13.

suspect's purported invocation."[20] For the relevant context, a court looks at what came before the invocation, not the defendant's responses to further questioning.[21]

Randmel concedes he initially waived his rights. But he asserts that he later unequivocally invoked them by saying he "would rather not say" in response to two questions that implied he was present for previous crimes. He likens his statements to the defendants' statements in In re Personal Restraint of Cross[22] and State v. Gutierrez,[23] who said, respectively, "I don't want to talk about it" and "[I] would rather not talk about it" after police advised them of their rights. The defendant in Cross said he did not want to talk about "it" immediately after being read his rights. He had not spoken with the police about the incident as Randmel had. The Supreme Court found that any reasonable officer would have understood "it" to refer to the murders.[24] Likewise, in Gutierrez, the defendant said he would rather not talk about "it" immediately after being read his rights and asked about the drugs in front of him.[25] In both cases, the defendants made their statements immediately after being advised of their rights and before answering any other questions.

---

[20] Cross, 180 Wn.2d at 682-83.
[21] See Smith v. Illinois, 469 U.S. 91, 92, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984); Piatnitsky, 180 Wn.2d at 418.
[22] 180 Wn.2d 664, 675, 327 P.3d 660 (2014).
[23] 50 Wn. App. 583, 586, 589, 749 P.2d 213 (1988). "[W]e draw no distinctions between the invocations of different Miranda rights." Piatnitsky, 180 Wn.2d at 413.
[24] Cross, 180 Wn.2d at 684.
[25] Gutierrez, 50 Wn. App. at 586.

Cross and Gutierrez are distinguishable. In contrast to the officers in those cases, a reasonable officer here would not interpret Randmel's statements as declining to answer any more questions. Randmel told Officer Douglas he was willing to speak about the stolen vehicle. He never told either officer that he did not want to talk about the stolen vehicles or that he wanted to stop talking altogether; he said only that he did not want to respond to certain questions about being tracked by dogs. To his second such demurral, he added coyly that "'he has been known to climb trees.'" Before these equivocal statements, he answered questions about the vehicle he was arrested for stealing.

Thus, Randmel did not unequivocally invoke his right to remain silent. His statements that he would "rather not say" were at best equivocal. Under the federal constitution, an interrogating officer need not stop questioning at an equivocal invocation of the right against self-incrimination.[26] Federal constitutional law therefore did not prohibit the trial court from admitting Randmel's statements.

Next, Randmel asserts that even if his statement that he would "rather not say" was equivocal, article I, section 9 of the Washington Constitution required Woodward to stop questioning him, except to clarify his statement.[27]

"Whenever a claim of right is asserted under the Washington Constitution, the first step is to determine if the asserted right is more broadly protected under the state constitution than it is under federal constitutional law."[28] Randmel asks

---

[26] Davis, 512 U.S. at 461-62; Cross, 180 Wn.2d at 683.
[27] See Davis, 512 U.S. at 461-62; Cross, 180 Wn.2d at 683.
[28] State v. Earls, 116 Wn.2d 364, 374, 805 P.2d 211 (1991).

this court to apply the six-factor analysis from State v. Gunwall.[29] He asserts this analysis shows that article I, section 9 of the Washington Constitution provides broader protections than the Fifth Amendment when a suspect equivocally invokes his right to remain silent.[30]

The State denies any need for this analysis. It relies on the Washington Supreme Court's statement in State v. Earls[31] that "the protection of article 1, section 9 is coextensive with, not broader than, the protection of the Fifth Amendment." The court in Earls declined to apply a Gunwall analysis to decide whether, "as a matter of state law, an otherwise valid waiver of constitutional rights is vitiated if police officers do not inform a suspect of the efforts of an unretained attorney to contact him."[32]

Division Two of this court recently relied on the quoted language from Earls in State v. Horton,[33] when it declined to perform a Gunwall analysis. In Horton, the court considered whether an officer should have stopped questioning and inquired about the defendant's intent when the defendant equivocally invoked his right to counsel.[34] The defendant made an argument similar to Randmel's. He asserted

---

[29] 106 Wn.2d 54, 720 P.2d 808 (1986).

[30] Article I, section 9 states, "No person shall be compelled in any criminal case to give evidence against himself, or be twice put in jeopardy for the same offense." The Fifth Amendment states, in relevant part, "No person . . . shall be compelled in any criminal case to be a witness against himself."

[31] 116 Wn.2d 364, 374-75, 805 P.2d 211 (1991).

[32] Earls, 116 Wn.2d at 372-74.

[33] 195 Wn. App. 202, 216-17, ___ P.3d ___ (2016), petition for review filed, No. 93575-1 (Wash. Aug. 25, 2016).

[34] Horton, 195 Wn. App. at 215.

that State v. Robtoy[35] required the officer to stop all questioning except to clarify his ambiguous invocation of his right to counsel.[36] Division Two observed that "Washington courts have consistently ruled ... that the state constitutional protections under article I, section 9, and the federal constitutional protections under the Fifth Amendment are the same."[37] It decided that no Gunwall analysis was required as the issue had been decided.[38]

The Supreme Court's opinion in State v. Russell[39] directly contradicts the State's position about the need for a Gunwall analysis here. As a result, we do not find Horton or Earls determinative. Two years after Earls, the court in Russell considered whether under article I, section 9 the trial court should have suppressed physical evidence that was the "fruit" of a voluntary but "un-Mirandized" statement.[40] The State contended, as it did in Horton and does here, that the court did not need to do a Gunwall analysis because the Earls opinion squarely stated that "the protection of article 1, section 9 is coextensive with, not broader than, the Fifth Amendment."[41] The Russell court rejected this argument. It observed that

---

[35] 98 Wn.2d 30, 653 P.2d 284 (1982).

[36] Horton, 195 Wn. App. at 215-16. Division Two noted that this argument echoed the dissent in Earls, which the majority there rejected.

[37] Horton, 195 Wn. App. at 217.

[38] Horton, 195 Wn. App. at 216. The Supreme Court has explicitly acknowledged that "[a]s far as the Fifth Amendment is concerned, Davis states the law, not Robtoy." State v. Radcliffe, 164 Wn.2d 900, 906, 194 P.3d 250 (2008). The court declined to address the defendant's argument that article I, section 9 affords broader protections than the Fifth Amendment because the defendant had not raised the issue below. Radcliffe, 164 Wn.2d at 907.

[39] 125 Wn.2d 24, 882 P.2d 747 (1994).

[40] Russell, 125 Wn.2d at 56-57.

[41] Russell, 125 Wn.2d at 57-58 (quoting Earls, 116 Wn.2d at 374-75).

the State quoted the language from Earls "out of context, thereby giving Earls an overly expansive interpretation and running afoul of an important principle of constitutional construction."[42] It held instead that

> [a] determination that a given state constitutional provision affords enhanced protection in a particular context does not necessarily mandate such a result in a different context. State v. Boland, 115 Wn.2d 571, 576, 800 P.2d 1112 (1990). Similarly, when the court rejects an expansion of rights under a particular state constitutional provision in one context, it does not necessarily foreclose such an interpretation in another context.[43]

Thus, the court explained, its statement in Earls does not mean that article I, section 9 of the Washington Constitution and the Fifth Amendment are coextensive in all contexts. The court then performed a Gunwall analysis for the issue before it.[44]

Accordingly, because no Washington court has performed a Gunwall analysis to compare article I, section 9 and the Fifth Amendment where a suspect equivocally invoked his right to remain silent, a Gunwall analysis is necessary here. As a result of the State's incorrect position, we do not have the benefit of its Gunwall analysis.

The Gunwall factors are "(1) the textual language; (2) differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences;

---

[42] Russell, 125 Wn.2d at 58.

[43] Russell, 125 Wn.2d at 58.

[44] The court ultimately concluded "that the Gunwall factors do not support extending greater protection through Const. art. 1, § 9 than that provided by the federal constitution in th[at] context. . . . Policy considerations alone are insufficient . . . to trigger an expansive reading of Const. art. 1, § 9." Russell, 125 Wn.2d at 62.

-12-

and (6) matters of particular state or local concern."[45]  Because the Supreme Court has analyzed the same two provisions in other contexts, we need to analyze only the fourth and six Gunwall factors here.[46]  We conclude that those factors do not support a more expansive meaning for article I, section 9 than the Fifth Amendment when a suspect equivocally invokes the right to remain silent.

The context does not change our consideration of the other four factors, which the Supreme Court addressed in Russell.[47]  We address them only briefly.

The first two factors compare the text of the two provisions.  Article I, section 9 states, "No person shall be compelled in any criminal case to give evidence against himself."  (Emphasis added.)  The Fifth Amendment states, "[N]or shall [any person] be compelled in any criminal case to be a witness against himself." (Emphasis added.)  Contrary to Randmel's assertions, the relationship between these texts is well established:  "this difference in language is without meaning."[48]

The court in Russell found that the third factor did not support an independent interpretation either, as the court "ha[d] not been presented with any evidence suggesting that the framers of . . . 'model' state constitutions"—on which the Washington Constitution is based—"intended any different result than that

---

[45] Gunwall, 106 Wn.2d at 58.
[46] See State v. Boland, 115 Wn.2d 571, 576, 800 P.2d 1112 (1990) ("Since Gunwall involved comparing the same constitutional provisions as those to be examined here, we adopt its analysis of the first, second, third and fifth factors and examine only the fourth and sixth factors as they apply to this particular case.").
[47] Russell, 125 Wn.2d at 58 (citing Boland, 115 Wn.2d at 576).
[48] Russell, 125 Wn.2d 60; see State v. Moore, 79 Wn.2d 51, 55-57, 483 P.2d 630 (1971); Earls, 116 Wn.2d at 376.

reached under the federal constitution."[49] Randmel's sole contention here is based on the same textual differences the Supreme Court has repeatedly rejected.

"Our consideration of th[e fifth] factor is always the same; that is that the United States Constitution is a grant of limited power to the federal government, while the state constitution imposes limitations on the otherwise plenary power of the state."[50] This factor thus "supports an independent state constitutional analysis in every case."[51]

The fourth factor considers "[p]reviously established bodies of state law, including statutory law."[52] The court noted in Gunwall that "[s]tate law may be responsive to concerns of its citizens long before they are addressed by analogous constitutional claims. Preexisting law can thus help to define the scope of a constitutional right later established."[53]

Randmel cites no preexisting state law that supports broader protection under article I, section 9. He cites neither Washington statutes nor common law applying the Washington Constitution. He instead relies on Washington cases interpreting the federal constitution. He correctly notes that between 1982, when

---

[49] Russell, 125 Wn.2d at 59; see Moore, 79 Wn.2d at 55-57; Earls, 116 Wn.2d at 376.

[50] State v. Foster, 135 Wn.2d 441, 458-59, 957 P.2d 712 (1998).

[51] Foster, 135 Wn.2d at 458.

[52] Gunwall, 106 Wn.2d at 61.

[53] Gunwall, 106 Wn.2d at 61-62. For example, the Gunwall court noted Washington's "long history of extending strong protections to telephonic and other electronic communications," including a 1909 statute "which makes it a misdemeanor for anyone to wrongfully obtain knowledge of a telegraphic message" and was based on the prestatehood Code of 1881, which "extensively regulated telegraphic communications." Gunwall, 106 Wn.2d at 66.

the Washington Supreme Court decided Robtoy, and 1994, when the United States Supreme Court decided Davis v. United States,[54] a suspect's equivocal invocation of the right to counsel required officers to cease questioning except to clarify the statement.[55] Randmel is incorrect, however, that this is "preexisting state law" that supports a broader application of article I, section 9 than of the Fifth Amendment. Robtoy based its holding on an extended discussion of Fifth Circuit interpretation of the Fifth Amendment.[56] Robtoy and its progeny thus interpreted the federal constitution, not Washington's. The relatively brief existence of this interpretation of federal constitutional law by Washington courts does not constitute the "established bod[y] of state law" that the court found to weigh in favor of an expansive interpretation of the state constitutional provision in Gunwall.[57] It is neither state law nor established.

The cases Randmel cites from other states likewise have no bearing on the fourth Gunwall factor, which concerns this state's case law; instead, they punctuate the lack of such jurisprudence under this state's laws.[58]

---

[54] 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994).
[55] Robtoy, 98 Wn.2d at 37. The Washington Supreme Court recognized in Radcliffe that Davis had abrogated Robtoy. Radcliffe, 164 Wn.2d at 902; see also Cross, 180 Wn.2d at 682.
[56] See Robtoy, 98 Wn.2d at 38-39.
[57] See Gunwall, 106 Wn.2d at 61, 66 (interpreting article I, section 7).
[58] Randmel cites Gunwall, 106 Wn.2d at 67-68, for the proposition that other states' constitutional decisions are relevant "in determining scope of protection under article 1, section 9." But Gunwall quoted Colorado and New Jersey opinions in discussing the sixth factor, matters of local interest, not in assessing this state's preexisting law.

Finally, the sixth Gunwall factor asks, "Is the subject matter local in character, or does there appear to be a need for national uniformity?"[59]

Although in general "[s]tate law enforcement measures are a matter of local concern,"[60] the Russell court recognized the national character of the issue in this case:

> [T]he specific exclusionary rule here at issue is peculiarly federal in nature. It is based on a federal case [Miranda] interpreting the federal constitution. Moreover, this court has not held that Miranda (or similar) warnings are required independently under the state constitution. Thus, this case involves a national issue to a greater extent than do many other issues of criminal law.[61]

This analysis applies no differently here. The sixth factor thus weighs against an independent interpretation of article I, section 9.

We conclude that on balance Randmel shows no persuasive reason to apply the protections of article I, section 9 more broadly than those of the Fifth Amendment when a suspect equivocally invokes his right to remain silent. Neither the text of the respective constitutions, state statutory law, nor judicial interpretations of the state constitution warrants a broader application of article I, section 9. This conclusion is in accord with the decisions of other Washington

---

[59] Gunwall, 106 Wn.2d at 62. The court noted in Gunwall that "[t]he objective of national uniformity of rules regarding the availability of telephone records and the use of pen registers, important as that may be, is outweighed in this case by overwhelming state policy considerations to the contrary." Gunwall, 106 Wn.2d at 67.

[60] State v. Young, 123 Wn.2d 173, 180, 867 P.2d 593 (1994).

[61] Russell, 125 Wn.2d at 61-62.

courts, which have uniformly held that article I, section 9 does not create a broader right against self-incrimination than does the Fifth Amendment.[62]

References to Silence

Woodward testified that Randmel told him he would rather not answer questions. The State reminded the jury of that testimony in its closing argument:

> When Officer Woodward questioned Mr. Randmel, Officer Woodward described the other two K-9 tracks from the first incident. Like he said, he was asking, he wanted to know if his dog was not performing correctly on the first two pursuits for some reason. Mr. Randmel says he doesn't really want to describe or talk about that. Officer Woodward says, well, can I describe to you the two K-9 tracks and, basically, you can tell me if we got close. Mr. Randmel said that sounds about right. You have a good dog. If you are talking about the tree and everything that happened on those first two pursuits.

Randmel contends that this was an improper comment on Randmel's invocation of his right to remain silent.

"Courts are appropriately reluctant to penalize anyone for the exercise of any constitutional right."[63] Thus, a prosecutor may not intentionally invite a jury to infer guilt from a defendant's invocation of the right to remain silent.[64] Washington courts "distinguish[ ] between comments on silence and mere reference to silence," however.[65]

As discussed above, Randmel did not invoke his right to remain silent. Thus, the prosecutor's reference to his response to two of Woodward's questions

---

[62] See Earls, 116 Wn.2d at 374-75; Russell, 125 Wn.2d at 62; Horton, 195 Wn. App. at 217; State v. Allenby, 68 Wn. App. 657, 662, 847 P.2d 1 (1992).
[63] State v. Burke, 163 Wn.2d 204, 221, 181 P.3d 1 (2008).
[64] Burke, 163 Wn.2d at 222.
[65] Burke, 163 Wn.2d at 221.

was not improper. In addition, Randmel did not object to the prosecutor's comment at trial and does not identify any "practical and identifiable consequences" that the trial court could not have cured with an instruction; he thus failed to preserve this claim. For these reasons, we find no error in the State's references to Randmel's demurrals.

Legal Financial Obligations

Randmel asks that even if this court affirms his conviction, it remand for the trial court to make an individualized inquiry into his ability to pay discretionary LFOs. The trial court assessed Randmel $450 in court costs and $1,800 in court-appointed attorney fees. The court waived the costs of appellate review, however, because it found Randmel indigent.

Under RCW 10.01.160(3), a trial court "shall not order a defendant to pay costs unless the defendant is or will be able to pay them." When a trial court imposes costs, "[t]he record must reflect that the trial court made an individualized inquiry into the defendant's current and future ability to pay."[66]

As the State concedes, the trial court did not conduct the inquiry that RCW 10.01.160(3) requires before it imposed discretionary LFOs on Randmel. The record contains no discussion about Randmel's ability to pay the $2,000 in discretionary LFOs that the trial court imposed. We therefore remand for the trial court to make an individualized inquiry into Randmel's current and future ability to pay whichever discretionary LFOs the court chooses to impose.

---

[66] State v. Blazina, 182 Wn.2d 827, 838, 344 P.3d 680 (2015).

## Appellate Costs

Finally, Randmel asks that this court use its discretion to deny any appellate costs the State may request as prevailing party. The trial court found Randmel indigent but made no finding about his future ability to pay.

"The commissioner or clerk 'will' award costs to the State if the State is the substantially prevailing party on review, 'unless the appellate court directs otherwise in its decision terminating review.'"[67] This court has discretion to consider the issue of appellate costs when a party raises the issue in its brief.[68]

In State v. Sinclair,[69] this court used its discretion to deny appellate costs to the State where the defendant remained indigent and this court saw "no realistic possibility," given that the defendant was 66 years old and received a 280-month prison sentence, that he would be able to pay appellate costs.

Here, because we are remanding for an inquiry about Randmel's future ability to pay discretionary LFOs, we also remand for the trial court to make a finding about his future ability to pay appellate costs. If the trial court finds that Randmel likely has a future ability to pay these costs, it shall award them to the State.

---

[67] State v. Sinclair, 192 Wn. App. 380, 385-86, 367 P.3d 612 (quoting RAP 14.2), review denied, 185 Wn.2d 1034 (2016).

[68] Sinclair, 192 Wn. App. at 388-90, 393.

[69] 192 Wn. App. 380, 393, 367 P.3d 612, review denied, 185 Wn.2d 1034 (2016).

## Conclusion

Because the State showed that Randmel possessed stolen vehicles on three occasions and was not required to prove every different method of possession, sufficient evidence supports Randmel's conviction. Because the Washington Constitution does not provide broader protections than the federal constitution when a suspect equivocally invokes the right to remain silent, the trial court did not err in admitting statements Randmel made to Officer Woodward. We affirm Randmel's convictions. But because the trial court did not conduct an individualized inquiry into Randmel's ability to pay, we remand for resentencing as to discretionary LFOs and for a determination about appellate costs.

WE CONCUR: